[Crim. No. 1789. In Bank.—February 16, 1914.]

## THE PEOPLE, Respondent, v. GORHAM TUFTS, JR. Appellant.

POWER OF ATTORNEY—REVOCATION—REINSTATEMENT BY ORAL DECLARATION.—A power of attorney, when once revoked by a writing of equal solemnity, cannot be reinstated and revived by mere oral declaration.

CRIMINAL LAW—FALSE PRETENSES—MISREPRESENTATION AS TO AUTHORITY UNDER POWER OF ATTORNEY—MATERIALITY OF REPRESENTATION. Where a husband obtains a loan by transferring vendor's lien notes which belong to his wife, his false representation that he has a power of attorney from her to make the transfer does not make him guilty of obtaining money under false pretenses, if the transfer of the notes by him would be valid under the law without any power of attorney. In order that the crime of obtaining money by false pretenses may be predicated upon a representation, the representation must be not only false but material.

ID.—LAW OF ANOTHER STATE—CONFLICTING EVIDENCE—DUTY OF COURT. If it appears on the trial for such offense that the property covered by the notes is in another state, and the evidence is conflicting as to the law of that state regarding the authority of the husband to transfer the notes, the court is neither authorized nor required to determine from the conflicting testimony what the settled law of that state may be, but it should assist the jury in reaching a just conclusion by analyzing the testimony and showing its possible application to the theories of the respective parties.

ID.—MISCONDUCT OF DISTRICT ATTORNEY—IMPUTATION OF IMMORALITY TO DEFENDANT.—In a prosecution for obtaining money by false pretenses it is misconduct warranting a reversal for the district attorney to repeatedly ask the defendant questions insinuating that he is

guilty of immoralties, over the objections of the defendant and the rulings of the court.

ID.—FUNCTIONS OF DISTRICT ATTORNEY—DUTY TOWARD DEFENDANT.— The function of a district attorney is largely judicial, and he owes to the defendant as solemn a duty of fairness as he is bound to give to the state full measure of earnestness and fervor in the performance of his official obligations.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Geo. H. Cabaniss, Judge presiding.

The facts are stated in the opinion of the court.

Earl Rogers, W. H. Dehm, H. L. Giesler, Paul W. Schenck, Ingle Carpenter, and Willedd Andrews, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

MELVIN, J.—Defendant was convicted of the crime of obtaining money by false pretenses. His appeal is from the judgment and from an order denying his motion for a new trial.

The substance of the indictment was that the defendant falsely represented that he had a power of attorney from his wife Jennie H. S. Tufts authorizing him to sign her name to promissory notes and to transfer certain valuable vendor's lien notes belonging to her to secure the payment of such loans. It was charged that Victor H. Steele, relying upon said false representations, loaned the defendant seven hundred dollars.

It appeared from the evidence that the defendant had held a power of attorney from his wife. This was very broad in its terms and would have been sufficient to authorize the defendant to do all that was done in the transaction with Steele. It was shown, however, that this power of attorney had been formally revoked and the revocation had been served upon defendant and had been, duly recorded. This occurred during a family quarrel, but defendant testified, and there was other evidence tending to show, that subsequently and before the money was borrowed from Steele, Mrs. Tufts had relented and had again authorized her husband to manage her affairs

for her. He testified that he believed her oral authorization was sufficient and that by it the power of attorney had been reinstated; and that he had acted in perfect good faith in asserting that he was attorney in fact for his wife. The court correctly instructed the jury that a power of attorney once revoked might not be revived by any oral declaration of the wife. So solemn an instrument as a power of attorney, when once revoked by a writing of equal solemnity, may not be reinstated and revivified by mere oral declaration.

The transaction between the defendant and Steele was consummated through an agent of the latter, a Mr. Fleming, who was an attorney at law. He stated that he visited the office of the defendant and was there shown certain vendor's lien notes that evidenced the indebtedness to Mrs. Tufts of certain residents of the state of Texas. Mr. Tufts stated that he had a power of attorney giving him the authority to sign his wife's name to a promissory note and to transfer the securities in her behalf. The writing was not found, although a search for it was made, but upon the assurance of the defendant and of a clerk in the office that the power of attorney existed, Mr. Fleming accepted the promissory note and securities bearing the name of the defendant and also that of Mrs. Tufts executed by him as her attorney in fact. The assignment of the vendor's lien notes, as collateral security for the principal debt of seven hundred dollars, provided that should the note for that sum be not paid when due the holder might sell the security at private or public sale without notice, applying the proceeds first to the payment of the note for seven hundred dollars, and next to the reasonable expenses of the sale, and that the residue, if any, should be paid to G. Tufts, Jr. The defendant calls our attention to the fact that Mr. Steele was not a witness either before the grand jury or at the trial and that the record is silent upon the following points: 1. It does not appear whether or not the sum called for in the principal obligation was paid to Victor H. Steele or his assignee; 2. Whether or not Mrs. Tufts acknowledged and paid the debt incurred for her by her husband presuming to act as her agent; 3. Whether or not Victor H. Steele sold the collateral at public or private sale as provided in the assignment; and, 4. Whether or not Victor H. Steele or any one was defrauded in any way by the transaction. The attorney-general takes

the position that these matters are entirely immaterial. He insists that having established the fact that Fleming, agent for Steele, would not have negotiated the loan if he had not believed the statement of the defendant that he possessed a written power of attorney, and the further fact that this representation was false, the case for the prosecution was complete. He seems to pin his faith on the case of *People* v. *Bryant,* 119 Cal. 596, [51 Pac. 960]. In that case it was held that where the defendant was charged with selling a note and mortgage representing that the latter applied to certain valuable realty, whereas in fact it was a lien upon other and worthless lots, the indictment need not contain the allegations that the maker of the note was unable to pay it or that it had not been paid. The court said, among other things: "If a person is induced to part with his property by reason of fraudulent pretenses and misrepresentations, he is thereby defrauded of the property so parted with even though he may eventually make himself whole in some mode not then contemplated." There is no doubt of the correctness of the principle announced in the Bryant case, but the words "in the mode contemplated" do not refer to mere matters of procedure in enforcing the security taken. It was the theory of the defendant's counsel both at the trial and on appeal that even if the power of attorney had not been revived by Mrs. Tufts in an oral authorization to her husband to deal with her property as he had done prior to their quarrel, nevertheless, under the laws of Texas he might assign the vendor's lien notes without power of attorney. If that were true, the nonexistence of the power of attorney would be immaterial. Of course, Mr. Steele had the right to be protected by collateral security which might be enforced "in the mode contemplated" but that does not mean that he was entitled to enforce it only upon the theory that the defendant held a written power of attorney. The representation that the particular authority asserted by Tufts existed would have to be not only false, but *material* in order that the crime of obtaining money by false pretenses might be predicated upon it. For example, if I make a purchase and pass to the vendor an envelope and tell him that it contains the purchase price in United States gold certificates, he is not defrauded if, as matter of fact, the envelope contain silver certificates of

exactly the same value and universally current in business transactions. Where the prosecutor gets out of the transaction just what he bargained for no offense is committed. (19 Cyc. 411; 12 Am. & Eng. Ency. of Law, p. 828.) This is true even where the vendor misrepresented the character or capacity in which he acted in making the sale. (*United States* v. *Rush,* 196 Fed. 580.)

The court permitted testimony to be introduced with reference to the law of Texas regarding the authority of a husband to manage his wife's property. There was testimony on the part of the prosecution that the laws of Texas did not give the husband that right and the defense introduced testimony of a contrary nature. The judge stated, during the trial, that he would instruct at the proper time on the law of Texas, but he failed to give any instruction whatever on the subject. It was not his duty to tell the jury what the law of Texas applicable to the case actually was, because the law of a foreign state on a particular subject is a matter of fact to be proven like any other fact (*Wickersham* v. *Johnston,* 104 Cal. 411, [43 Am. St. Rep. 118, 38 Pac. 89]; *Ryan* v *North Alaska Salmon Co.,* 153 Cal. 439, [95 Pac. 862]), and in this case, there being a conflict of testimony, the judge of the trial court was neither authorized nor required to determine from the conflicting testimony what the settled law of Texas may have been. He should have aided the jury, however, by an analysis of the conflicting theories. The testimony regarding the Texas law was properly admissible. The vendor's lien notes covered property situated in Texas. They could only be foreclosed in that state. If under the evidence, the defendant, as husband of Mrs. Tufts, had the right to sign her name by virtue of the laws of that state, then his indorsement would have been recognized there and Mr. Steele would have received exactly what he bargained for. Counsel for the defendant have filed a very able and elaborate brief in which they seek to show that under the laws of Texas (1) the written power of attorney would have conferred no authority upon defendant to dispose of the vendor's lien notes; that (2) the notes were *prima facie* the common property of the defendant and his wife, and as such were subject to disposition by him without her consent; that (3) even if it be conceded that the notes were the separate property of Mrs. Tufts and that

Mr. Steele knew that fact, her acquiescence in the loan, shown by her conduct in using part of the money, gave her husband the right to act for her under the law of Texas. It is not necessary for us to review these interesting questions, because as we have indicated, there was at the trial a conflict of testimony. We think that the court should have endeavored to assist the jury in reaching a just conclusion by analyzing the testimony and showing its possible application to the theories of the respective parties. We are not prepared to assert, however, that we would reverse the judgment for this omission. We speak for the guidance of the court if a new trial shall be had.

The judgment should be reversed, however, because of the misconduct of the district attorney. It sufficiently appears from the statement of the case contained herein, that there was a strong showing to the effect that the defendant believed he was authorized to act under a revived power of attorney. There was testimony tending to prove the theory of the defense that under the law of Texas Mr. Steele received exactly what he bargained for in the way of security. In this state of the case the misconduct of the district attorney in persistently imputing vile immoralities to the defendant operated, we believe, to deprive him of a fair trial and caused a miscarriage of justice.

While the prosecutor was examining one of the witnesses for the state—a Miss Baker—who was Mrs. Tufts' secretary, the following occurred as shown by the record on file in this court:

"Q. Are you acquainted with Charles Parnell, sitting in the court room here? A. I am.

"Q. How long have you known him? A. Since I first went to Chester Place. I saw him there the first day I went there.

"Q. A great many of the differences between these parties centered around that man, didn't they? A. They did.

"Mr. Carpenter: I object to that.

"The Court: Sustained.

"Mr. Horton: Mr. Parnell would be the co-respondent.

"Mr. Carpenter: We object to that.

"The Court: I wouldn't say that, Mr. Horton. I would like to confine the evidence to the issues in this case. Don't go outside.

"Mr. Carpenter: I object to all of these statements by Mr. Horton on that point.

"The Court: I think the objection is well taken. What Mr. Horton said in reference to a co-respondent and the like, gentlemen of the jury, you will ignore as a statement that has no relation whatsoever to this case; and I will say to you now, as I will later more formally, that you would consider, when you finally determine this matter, only the evidence in the case; and the arguments of counsel you will consider and give such weight to them as you think them entitled to; and of course you will consider what the court has to say to you concerning the law. But all these side remarks made by counsel are to be ignored and need not be considered at all."

Counsel for appellant insists (and judging from the context he is probably correct) that after the word "Sustained" the court said: "I am not trying a divorce case." This would explain counsel's remark about a "co-respondent." Later in the trial, during the cross-examination of the defendant, the prosecuting officer asked the witness if he and his wife had not been having difficulty over Parnell and his living at the house. Objection to this question was sustained and an answer to it was stricken out. Later, indicating Parnell as "that little fellow over there by the wall," counsel asked the defendant if he had not discussed his testimony with Parnell. Again, while the prosecuting counsel was asking the defendant questions with reference to a conversation which the latter had held with his wife, the following occurred:

"And wasn't there something said in that conversation about her having insisted that you send Charles T. Parnell out of the house to the Hawaiian Islands? A. Absolutely not.

"Q. That settles that. And didn't she explain in that conversation—

"The Court: Mr. Horton, in view of my ruling, I don't think I would ask any questions as to the alleged conversations touching Parnell, because any question that you could frame upon that subject would be objectionable just as the one that was awhile ago.

"Mr. Horton: I only have one or two more questions on that line, your Honor.

"The Court: All right.

"Q. By Mr. Horton: And didn't she say as part of that same conversation, during these long evening hours, that she had come to the conclusion that you were enjoying illicit relations with Charles T. Parnell?

"Mr. Carpenter: I object to that and ask that be stricken out.

"Mr. Horton: If any other woman than the wife in this case were interested, she could go upon the stand.

"Mr. Carpenter: Yes, and there was a reconciliation after this.

"Mr. Horton: It didn't last long.

"The Witness: Let me say to you that absolutely no reference was made to Mr. Parnell in that conversation whatever. It was altogether of C. W. Burns, who had been her former student in Christian Science, and proved himself a rogue.

"Q. Well, you bought an automobile for Charles T. Parnell out of her money, didn't you?  A. Absolutely not.

"Q. And it was licensed in his name, wasn't it—answer me yes or no now.

"Mr. Carpenter: I object to that as irrelevant, incompetent and immaterial, and nothing whatsoever to do with the case.

"The Court: Sustained.  That certainly hasn't anything to do with this case."

Nothing could more aptly illustrate the unfair attitude of the prosecuting officer than the last quotation.  After the court had repeatedly ruled that the aversion of Mrs. Tufts to Parnell, if it existed, had nothing to do with the case, and after many objections to such questions had been sustained, counsel made an insinuation so vile that it must have been shocking to the sense of decency of the jurors, and uttered as it was by one in high authority, it must have been prejudicial to the defendant's rights.  Not content with this broad insinuation that the man on trial for his liberty was a sexual pervert, the prosecutor improperly commented upon the action of the defendant in objecting as he had an undoubted right to do under the law, to his wife's testifying against him.  It is to be regretted that prosecuting counsel, in the heat of contest and in the desire for victory, sometimes forget that the function of a district attorney is largely judicial, and that he owes to the defendant as solemn a duty of fairness as he is

bound to give to the state full measure of earnestness and fervor in the performance of his official obligations. Again and again has this court commented upon the course of prosecutors in this regard, but instances of such conduct are all too common. We have no doubt that in the present case the prosecutor's demeanor and his improper questions deprived the defendant of that fair trial which ought to have been his under the law. For this reason he should not be subjected to the result of a verdict so induced. (*People* v. *Valliere*, 127 Cal. 65, [59 Pac. 295]; *People* v. *Derwae*, 155 Cal. 593, [102 Pac. 266]; *People* v. *Mohr*, 157 Cal. 734, [109 Pac. 476]; *People* v. *Grider*, 13 Cal. App. 709, [110 Pac. 586].)

Judgment and order are reversed.

Henshaw, J., Lorigan, J., and Shaw, J., concurred.